**REDACTED**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| In Re:  AUTOMOTIVE PARTS ANTITRUST LITIGATION | 12-md-02311 |
|  | Honorable Marianne O. Battani |
| In re:  AUTOMOTIVE LAMPS | 2:13-cv-01202-MOB-MKM |
| THIS RELATES TO: | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| ALL AUTOMOBILE DEALER ACTIONS | JURY TRIAL DEMANDED |
|  | **[FILED UNDER SEAL-HIGHLY CONFIDENTIAL]** |

1

REDACTED

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"); Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."); Green Team of Clay Center Inc. ("Plaintiff Green Team"); McGrath Automotive Group, Inc. ("Plaintiff McGrath "); Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"); Bonneville and Son, Inc. ("Plaintiff Bonneville"); Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou");  John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"); Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"); Ramey Motors, Inc. ("Plaintiff Ramey"); Thornhill Superstore, Inc., d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"); Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota "); Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Lee Auto Malls-Topsham,

REDACTED

Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"); Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"); Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda ("Plaintiff Ancona"); Bill Pearce Motors d/b/a Bill Pearce Courtesy Honda ("Plaintiff Pearce"); HC Acquisition, LLC d/b/a Toyota of Bristol ("Plaintiff Bristol"); and Apex Motor Corporation ("Plaintiff Apex") ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and allege as follows:

## NATURE OF ACTION

1.          Plaintiffs bring this lawsuit as a proposed class action against Defendants Koito Manufacturing Co., Ltd.; North American Lighting, Inc. (together, "Koito Defendants" or "Koito"); Mitsuba Corporation, American Mitsuba Corporation (together, "Mitsuba Defendants" or "Mitsuba"); Stanley Electric Co., Ltd., Stanley Electric U.S. Co., Inc., and II Stanley Co., Inc. (collectively, "Stanley Defendants" or "Stanley") (all as defined below, and collectively "Defendants"); and unnamed co-conspirators, manufacturers and/or suppliers of Automotive Lamps (defined below) globally and in the United States, for engaging in a lenthy conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of these products, which were sold to automobile manufacturers in the United States and elsewhere.  The Defendants' conspiracy successfully targeted the United

**REDACTED**

States automotive industry, raising prices for car manufacturers, and car and truck dealers.

2.      "Automotive Lamps," as used herein, include headlamps and rear combination lamps installed by automobile original equipment manufacturers ("OEMs"). A headlamp is an Automotive Lamp installed in the front of an automobile, which consists of lights such as headlights, a clearance lamp, and turn signals. A rear combination lamp is an Automotive Lamp installed in the rear of an automobile, which consists of lights such as a backup lamp, stop lamp, tail lights, and turn signals.

3.      The "Class Period" refers to July 1, 2002, to the present.

4.      The Defendants manufacture, market, and sell Automotive Lamps throughout the United States and in other countries.

5.      Vehicles containing Automotive Lamps, as well as Automotive Lamps themselves, made by Defendants, are sold in every state of the United States and the District of Columbia.

6.      Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Lamps. Competition authorities in Japan and possibly elsewhere, have been investigating a conspiracy in the market for Automotive Lamps since at least March 2012.  The Japanese Fair Trade Commission ("JFTC") has raided the offices of Defendants.

7.      The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of

**REDACTED**

different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry. The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and and the potential volume of commerce affected by the alleged illegal conduct. The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.5 billion in criminal fines.

8.　　　Defendant Koito Manufacturing Co., Ltd. agreed to plead guilty to a two-count criminal Information and to pay a $56.6 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automobile lighting fixtures and automotive high-intensity discharge ("HID") lamp ballasts sold to automobile manufacturers in the United States and elsewhere from at least as early as June 1997 until about July 2011 and from at least as early as July 1998 until at least February 2010, respectively. The combination and conspiracy engaged in by Defendant Koito Manufacturing Co., Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

9.　　　Defendant Mitsuba Corporation agreed to plead guilty and to pay a criminal fine of $135 million for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive parts sold to automobile manufacturers, including Honda Motor Company, Ltd., Fuji Heavy Industries Ltd.,

**REDACTED**

Nissan Motor Company, Ltd., Toyota Motor Corporation, Chrysler Group LLC, and certain of their subsidiaries, affiliates and suppliers in the United States and elsewhere, from at least as early as January 2000 through at least February 2010. "Automotive parts," for purposes of the plea agreement, included windshield wiper systems and components thereof, windshield washer systems and components thereof, starter motors, power window motors, fan motors, radiator fans, door mirrors, lamps, power seat motors, sunroof, door and tailgate motors, electric power steering motors, electronic throttle motors, horns, automotive electric relays and switches, automotive electric actuators, AC generators, and fuel pumps. The combination and conspiracy engaged in by Defendant Mitsuba Corporation and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

10.        In addition to the fact that Defendant Mitsuba Corporation pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperating in the government's investigation, several of its high-ranking executives have pleaded guilty to, or been indicted for, criminal price-fixing in the automotive parts industry.

11.        On December 1, 2014, the DOJ announced that a former executive of Defendant Mitsuba, Kazumi Umahashi, agreed to serve thirteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count Information charging him with conspiring to fix the prices of certain automotive parts installed in cars sold in the United States and elsewhere. According to the Information, Kazumi Umahashi participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, windshield wiper systems and starter motors sold to Honda Motor Company Ltd. and

**REDACTED**

certain of its subsidiaries, affiliates, suppliers, and others in the United States and elsewhere.

12.      On February 5, 2015, the DOJ announced that a federal grand jury returned a two-count Indictment against two former executives of Defendant Mitsuba Corporation, Hiroyuki Komiya and Hirofumi Nakayama, for (1) conspiring to fix the prices of various automotive parts, including windshield wiper systems and components, sold to Honda Motor Company Ltd., Nissan Motor Co. Ltd., Toyota Motor Corp., Chrysler Group, LLC, Fuji Heavy Industries Ltd., and certain of their subsidiaries in the United States and elsewhere; and (2) for knowingly and corruptly persuading, and attempting to persuade, employees of Mitsuba to destroy documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere.

13.      According to the plea agreements of Defendant Mitsuba and its former executives, conspiratorial meetings and discussions took place in the United States and elsewhere, and the automotive parts that were the subject of the conspiracy were sold to Honda Motor Company Ltd., Nissan Motor Co. Ltd., Toyota Motor Corp., Chrysler Group, LLC, Fuji Heavy Industries Ltd., and certain of their subsidiaries, affiliates, and suppliers located in the U.S. and elsewhere by Defendant Mitsuba and its U.S. subsidiaries located in the Eastern District of Michigan and elsewhere.

14.      Defendant Stanley Electric Co., Ltd. agreed to plead guilty to a one-count criminal Information and to pay a $1.44 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, automotive HID lamp ballasts sold to automobile manufacturers in the United States and elsewhere from

7

**REDACTED**

as early as July 1998 until at least February 2010.  The combination and conspiracy engaged in by Defendant Stanley Electric Co., Ltd. and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

15.     Competition authorities in Japan and possibly elsewhere have also been investigating a conspiracy in the market for Automotive Lamps since at least March 2012. The Japanese Fair Trade Commission ("JFTC") raided the offices of Defendants. On March 21, 2013, the JFTC announced that it had levied fines totaling $49.1 million, including a $36 million fine against Defendant Koito Manufacturing Co., Ltd. for violating antitrust laws by forming a cartel to fix prices for Automotive Lamps. On March 21, 2013, the JFTC also announced the imposition of cease-and-desist orders against Defendant Koito Manufacturing Co., Ltd., requiring it to (i) immediately pass resolutions that they would terminate any illegal conduct in the Automotive Lamps industry, (ii) contact any automobile maker who may have purchased its Automotive Lamps through collusive bidding processes, (iii) refrain from engaging in such illegal conduct in the future, and (iv) implement employee antitrust compliance programs. According to the JFTC, fellow conspirator Stanley Electric Co., Ltd. also violated antitrust laws, but did not receive a cease-and-desist order.

16.     The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and fix, stabilize, and maintain the prices of, Automotive Lamps sold to vehicle manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was

REDACTED

in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1, and state antitrust, unfair competition, consumer protection and unjust enrichment laws.

17.        As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Automotive Lamps. Plaintiffs and the members of the Classes have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

18.        Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

19.        This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants.

20.        Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the

**REDACTED**

events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

21.        This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Automotive Lamps throughout the United States that were specifically designed for vehicles that were intended to be sold in the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; (d) was through its own actions and through the actions of its co-conspirators, engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District; and/or (e) engaged in actions in furtherance of an illegal conspiracy in this district either itself or through its co-conspirators.. The Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

22.        The Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable, and intended anti-competitive effects upon interstate commerce within the United States and upon import trade and commerce into the United States.

**REDACTED**

23.        The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. The Defendants' products are sold in the flow of interstate commerce.

24.        Automotive Lamps manufactured abroad by the Defendants and sold for use in automobiles in the United States are goods brought into the United States for sale and therefore constitute import commerce. To the extent any Automotive Lamps are purchased in the United States, and such Automotive Lamps do not constitute import commerce, the Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial, and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes to in the United States.

25.        By reason of the unlawful activities hereinafter alleged, the Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  The Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for Automotive Lamps, which conspiracy unreasonably restrained trade and adversely affected the market for Automotive Lamps.

26.        The Defendants' conspiracy and wrongdoing described herein adversely affected persons and businesses in the United States who purchased Automotive Lamps, including Plaintiffs and the Classes.

REDACTED

# PARTIES

## Plaintiffs

27.      Plaintiff Martens is a Maryland corporation that had its principal place of business in the District of Columbia during the Class Period. During the Class Period Plaintiff Martens was an authorized Volvo and Volkswagen dealer who sold Volvo- and Volkswagen-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators.

28.      During the Class Period, Plaintiff Martens purchased vehicles containing Automotive Lamps manufactured by one or more of the Defendants or co-conspirators. Plaintiff Martens also purchased Automotive Lamps, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Martens purchased and received both these vehicles and Automotive Lamps in the District of Columbia. Plaintiff Martens has also displayed, sold, and advertised its vehicles in the District of Columbia during the Class Period.

29.      Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas. Plaintiff Landers is an authorized Toyota dealer who bought Toyota-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

30.      During the Class Period, Plaintiff Landers purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Landers also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class

REDACTED

Period. Plaintiff Landers purchased and received both the afore-mentioned vehicles and Automotive Lamps in Arkansas. Plaintiff Landers has also displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

31.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi. Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

32.     During the Class Period, Plaintiff Hammett purchased vehicles containing Automotive Lamps manufactured by Defendants or their co-conspirators. Plaintiff Hammett also purchased Automotive Lamps, manufactured by Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Hammett purchased and received both the afore-mentioned vehicles and Automotive Lamps in Mississippi. Plaintiff Hammett has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

33.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota. Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore. Plaintiff Superstore bought Buick- and GMC-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

**REDACTED**

34.       During the Class Period, Plaintiff Superstore purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Superstore also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Superstore purchased and received both the afore-mentioned vehicles and Automotive Lamps in Minnesota.  Plaintiff Superstore has also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

35.       Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida.  Plaintiff Lee is presently an authorized GMC dealer.  During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer. Plaintiff Lee buys GMC-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators.  During the Class Period, Plaintiff Lee bought Pontiac-, Oldsmobile-, and Jeep-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators.

36.       During the Class Period, Plaintiff Lee purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee purchased and received both the afore-mentioned vehicles and Automotive Lamps in

14

**REDACTED**

Florida.  Plaintiff Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

37.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who bought Chrysler-, Dodge-, and Jeep-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

38.     During the Class Period, Plaintiff Westfield purchased vehicles containing Automotive Lamps manufactured one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Westfield purchased and received both the afore-mentioned vehicles and Automotive Lamps in New York.  Plaintiff Westfield has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

39.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

40.     During the Class Period, Plaintiff V.I.P. purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators.

15

REDACTED

Plaintiff V.I.P. also purchased Automotive Lamps, for its repair and service business, during the Class Period. Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and Automotive Lamps in California. Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

41.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas. Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

42.     During the Class Period, Plaintiff Green Team purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Green Team also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Green Team purchased and received both the afore-mentioned vehicles and Automotive Lamps in Kansas. Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

43.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa. Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing Automotive Lamps  manufactured by one or more of the Defendants or their co-

16

**REDACTED**

conspirators, as well as Automotive Lamps  manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

44.     During the Class Period, Plaintiff McGrath purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff McGrath also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff McGrath purchased and received both the afore-mentioned vehicles and Automotive Lamps in Iowa.  Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

45.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who bought Hyundai-brand cars containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

46.     During the Class Period, Plaintiff Table Rock purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Table Rock also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and Automotive Lamps in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

**REDACTED**

47.          Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska. Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators.

48.          During the Class Period, Plaintiff Archer-Perdue purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Archer-Perdue also purchased Automotive Lamps , manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Archer-Perdue purchased and received both the afore-mentioned vehicles and Automotive Lamps in Nebraska. Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

49.          Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire. Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

50.          During the Class Period, Plaintiff Bonneville purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Bonneville also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class

18

**REDACTED**

Period.  Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and Automotive Lamps in New Hampshire.  Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

51.      Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

52.      During the Class Period, Plaintiff Pitre purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators.  Plaintiff Pitre also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Pitre purchased and received both the afore-mentioned vehicles and Automotive Lamps in New Mexico.  Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

53.      Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

54.      During the Class Period, Plaintiff Patsy Lou purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators.

REDACTED

Plaintiff Patsy Lou also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Patsy Lou purchased and received both the afore-mentioned vehicles and Automotive Lamps in Michigan. Plaintiff Patsy Lou has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

55. Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina. Plaintiff John Greene is an authorized Chrysler, Dodge, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

56. During the Class Period, Plaintiff John Greene purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff John Greene also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff John Greene purchased and received both the afore-mentioned vehicles and Automotive Lamps in North Carolina. Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

57. Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada. Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

REDACTED

58.          During the Class Period, Plaintiff Champion purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Champion also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Champion purchased and received both the afore-mentioned vehicles and Automotive Lamps in Nevada. Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

59.          Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

60.          During the Class Period, Plaintiff Commonwealth Motors purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Commonwealth Motors also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Commonwealth Motors purchased and received both the afore-mentioned vehicles and Automotive Lamps in Massachusetts. Plaintiff Commonwealth Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

61.          Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts. Plaintiff Commonwealth

**REDACTED**

Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

62.     During the Class Period, Plaintiff Commonwealth Volkswagen purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Commonwealth Volkswagen also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and Automotive Lamps in Massachusetts. Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

63.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts. Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

64.     During the Class Period, Plaintiff Commonwealth Nissan purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Commonwealth Nissan also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Commonwealth Nissan purchased and

**REDACTED**

received both the afore-mentioned vehicles and Automotive Lamps in Massachusetts. Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

65.　　　　Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

66.　　　　During the Class Period, Plaintiff Ramey purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Ramey also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Ramey purchased and received both the afore-mentioned vehicles and Automotive Lamps in West Virginia.  Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

67.　　　　Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

**REDACTED**

68.         During the Class Period, Plaintiff Thornhill purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Thornhill also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and Automotive Lamps in West Virginia. Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

69.         Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin. Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

70.         During the Class Period, Plaintiff Lakeland purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Lakeland also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and Automotive Lamps in Wisconsin. Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

71.         Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah. Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing Automotive Lamps

**REDACTED**

manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

72.     During the Class Period, Plaintiff Salt Lake Valley purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Salt Lake Valley also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and Automotive Lamps in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

73.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.   Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

74.     During the Class Period, Plaintiff Capitol Chevrolet purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators.    Plaintiff Capitol Chevrolet also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and Automotive Lamps in Oregon.  Plaintiff

**REDACTED**

Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

75.        Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

76.        During the Class Period, Plaintiff Capitol Toyota purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Capitol Toyota also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and Automotive Lamps in Oregon.  Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

77.        Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing Automotive Lamps manufactured by the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by the Defendants or their co-conspirators during the Class Period.

78.        During the Class Period, Plaintiff Wade purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Wade also purchased Automotive Lamps, manufactured by one or more

**REDACTED**

Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Wade purchased and received both the afore-mentioned vehicles and Automotive Lamps in Utah.  Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

79.        Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Toyota-brand cars containing Automotive Lamps manufactured by the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by the Defendants or their co-conspirators during the Class Period.

80.        During the Class Period, Plaintiff Johnson purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators.  Plaintiff Johnson also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Johnson purchased and received both the afore-mentioned vehicles and Automotive Lamps in Mississippi.  Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

81.        Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand cars containing Automotive Lamps manufactured by the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by the Defendants or their co-conspirators.

**REDACTED**

82.         During the Class Period, Plaintiff Hartley purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Hartley also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Hartley purchased and received both the afore-mentioned vehicles and Automotive Lamps in New York. Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

83.         Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine. Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing Automotive Lamps manufactured by the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by the Defendants or their co-conspirators during the Class Period.

84.         During the Class Period, Plaintiff Lee Honda purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Lee Honda also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and Automotive Lamps in Maine. Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

85.         Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine. Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-brand cars containing Automotive Lamps manufactured by the Defendants or their co-

**REDACTED**

conspirators, as well as Automotive Lamps manufactured by the Defendants or their co-conspirators during the Class Period.

86.         During the Class Period, Plaintiff Topsham purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Topsham also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Topsham purchased and received both the afore-mentioned vehicles and Automotive Lamps in Maine. Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

87.         Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi. Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing Automotive Lamps manufactured by the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by the Defendants or their co-conspirators during the Class Period.

88.         During the Class Period, Plaintiff Cannon Nissan purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Cannon Nissan also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Cannon purchased and received both the afore-mentioned vehicles and Automotive Lamps in Mississippi. Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

89.

REDACTED

90.        Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont.  Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

91.        During the Class Period, Plaintiff Shearer purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Shearer also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Shearer purchased and received both the afore-mentioned vehicles and Automotive Lamps in Vermont.  Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

92.        Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.  Plaintiff Empire Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as wells as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

93.        During the Class Period, Plaintiff Empire Nissan purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Empire Nissan also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.   Plaintiff Empire Nissan purchased and received both the afore-mentioned

**REDACTED**

vehicles and Automotive Lamps in California.  Plaintiff Empire Nissan has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

94.        Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer, who bought Subaru-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

95.        During the Class Period, Plaintiff Hodges purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Hodges also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.  Plaintiff Hodges purchased and received both the afore-mentioned vehicles and Automotive Lamps in Michigan.  Plaintiff Hodges has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

96.        Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas during the Class Period.  Plaintiff Ancona was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators.

97.        During the Class Period, Plaintiff Ancona purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators.

**REDACTED**

Plaintiff Ancona also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Ancona purchased and received both the afore-mentioned vehicles and Automotive Lamps in Kansas. Plaintiff Ancona has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

98.      Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period. Plaintiff Pearce was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators.

99.      During the Class Period, Plaintiff Pearce purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Pearce also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Pearce purchased and received both the afore-mentioned vehicles and Automotive Lamps in Nevada. Plaintiff Pearce has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

100.      Plaintiff Bristol is a Tennessee limited liability company with its principal place of business in Bristol, Tennessee. Plaintiff Bristol is an authorized Toyota dealer during the Class Period, who purchased Toyota- brand cars containing Automotive Lamps manufactured by the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by the Defendants or their co-conspirators.

**REDACTED**

101.     During the Class Period, Plaintiff Bristol purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Bristol also purchased Automotive Lamps manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Bristol purchased and received both the afore-mentioned vehicles and Automotive Lamps in Tennessee.  Plaintiff Bristol has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

102.     Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont.  Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Lamps manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

103.     During the Class Period, Plaintiff Apex purchased vehicles containing Automotive Lamps manufactured by one or more Defendants or their co-conspirators. Plaintiff Apex also purchased Automotive Lamps, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Apex purchased and received both the afore-mentioned vehicles and Automotive Lamps in Vermont.  Plaintiff Apex has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

**Defendants**

104.     When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the

33

REDACTED

corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

**Koito Defendants**

105.        Defendant Koito Manufacturing Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Koito – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. Koito is the number one supplier of Automotive Lamps in the world and holds a 26 percent share of the global market for such products. Koito is the parent corporation of North American Lighting, Inc., the leading manufacturer of automotive lighting products in the United States. In the United States, Koito supplies automotive lighting products to Toyota, Honda, Ford, BMW, Subaru, Mitsubishi, Nissan, Lexus, GM, and Chrysler. In 2011, Koito had net sales of $5.16 billion, including net sales in North America of $550 million.

106.        Defendant North American Lighting, Inc. is a Michigan corporation with its principal place of business in Illinois.  It is a subsidiary of and wholly-owned and/or controlled  by its parent, Koito Manufacturing Co., Ltd.  North American Lighting, Inc. manufactured,  marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period.

REDACTED

## Mitsuba Defendants

107.        Defendant Mitsuba Corporation is a Japanese corporation with its principal place of business in Gunma, Japan. Mitsuba – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. In 2011, Mitsuba had net sales of $2.52 billion, including net sales of $542 million in the United States, Mexico, and Brazil.

108.        Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of and wholly-owned and/or controlled  by its parent, Mitsuba Corporation.  American Mitsuba Corporation manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period.

109.        **Stanley Defendants**

110.        Defendant Stanley Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Stanley – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period. Stanley's major customers include Honda and Toyota. In 2011, Stanley had net sales of $2.98 billion, including net sales in North America of $396.4 million.

111.        Defendant Stanley Electric U.S. Co., Inc. is an Ohio corporation with its principal place of business in Ohio.  It is a subsidiary of and wholly-owned and/or controlled by its parent, Stanley Electric Co., Ltd.  Stanley Electric U.S. Co., Inc. manufactured,

REDACTED

marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period.

112.       Defendant II Stanley Co., Inc. is a Michigan corporation with its principal place of business in Michigan. It is a subsidiary of and wholly-owned and/or controlled by its parent, Stanley Electric Co., Ltd. II Stanley Co., Inc. manufactured, marketed, and/or sold Automotive Lamps that were sold and purchased throughout the United States, including in this District, during the Class Period.

## AGENTS AND CO-CONSPIRATORS

113.       Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

114.       Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

115.       Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's or limited liability entity's business or affairs.

**REDACTED**

## FACTUAL ALLEGATIONS

### A.    The Automotive Lamps Industry

116.          Automotive Lamps, as used herein, consist of headlamps and rear combination lamps. Headlamps on vehicles are primarily responsible for illuminating the road ahead during periods of low visibility, without blinding oncoming traffic. In addition, headlamps make a vehicle easily visible. Rear combination lamps functionally integrate communication signals from rear lights to inform drivers behind the vehicle of the presence of the car; stop lamps indicate that the brake is activated, turn signal lamps give a flashing warning light on the side of the vehicle toward the direction in which the car will be going, and backup lamps assure the safety of the rear side of the car and indicate that the vehicle is moving backwards. *See* Figures 1, 2, 3 and 4.

Figure 1 (Headlamp)



HEADLAMP

Figure 2 (Rear Combination Lamp)

**REDACTED**



REAR COMBINATION LAMP

Figure 3 (Headlamps)



Figure 4 (Rear Combination Lamps)



117.     Automotive Lamps are installed by OEMs in new cars as part of the automotive

manufacturing process.

38

**REDACTED**

118.　　　　For new cars, the OEMs—mostly large automotive manufacturers such as Nissan, Toyota, Fuji Heavy Industries (Subaru), Mitsubishi, and Mazda—purchase Automotive Lamps directly from Defendants. Automotive Lamps may also be purchased by component manufacturers who then supply such systems to OEMs. These component manufacturers are also called "Tier 1 Manufacturers" in the industry. Tier 1 Manufacturers supply Automotive Lamps directly to an OEM.

119.　　　　When purchasing Automotive Lamps, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years. Typically, the bidding process begins approximately three years prior to the start of production of a new model. Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and in the United States. *See* Figure 5 below, taken from the JFTC website.

**REDACTED**



2 Overview of the bidding processes for headlamps and rear combination lamps ordered by automobile companies

Figure 5

120.     Defendants and their co-conspirators supplied Automotive Lamps to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Lamps (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the

REDACTED

United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

121.       Plaintiffs and members of the proposed Classes purchased Automotive Lamps indirectly from one or more of the Defendants and their co-conspirators. By way of example, automobile dealers indirectly purchase Automotive Lamps from the Defendants when they purchase new vehicles to sell or lease to consumers.

122.       In 2014, the U.S. market for automotive lighting is estimated to be $19.97 billion by *Transparency Market Research*. More than 90 percent of automotive lighting is related to exterior lighting and the headlamp market alone accounts for more than 70 percent of total automotive lighting.

123.       According to *Allied Market Research*, the automotive lighting market is anticipated to grow at a compound annual growth rate of 6.7 percent from 2014 to 2020. The global market value for automotive lighting is projected to reach USD 33.7 billion by 2020, though this includes interior and side lighting in addition to front and rear lighting.

**B.     The Structure and Characteristics of the Automotive Lamps Market Render the Conspiracy More Plausible**

124.       The structure and other characteristics of the Automotive Lamps market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Automotive Lamps market: (1) has high barriers to entry; (2) has inelasticity of demand; and (3) is rife with opportunities to conspire.

**1.     The Automotive Lamps Market Has High Barriers to Entry**

125.       A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the

**REDACTED**

supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

126.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Lamps market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

127.     Each of the Defendants also owns at least one patent for Automotive Lamps. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

128.     In addition, OEMs cannot randomly change Automotive Lamp suppliers after a supplier is initially selected because the OEMs design the features of their vehicles so that the Automotive Lamps it purchases for a vehicle are then integrated with the electronics, mechanics, thermal distribution, and other features of the particular vehicle model. Thus, the design must be synergized by the Automotive Lamps manufacturers and OEMs. It would be difficult for a new market entrant to do so.

### 2.     There is Inelasticity of Demand for Automotive Lamps

129.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

**REDACTED**

130.        For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

131.        Demand for Automotive Lamps is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Automotive Lamps as an essential part of a vehicle, even if the prices are kept at a supra-competitive level. Customers wanting to purchase a car simply have no choice but to purchase Automotive Lamps.

### 3.        Defendants had Ample Opportunities to Conspire

132.        Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy. Members of the Automotive Lamps industry regularly hold symposiums to communicate the most recent technologies in the industry. As one industry publication explained, "life in the world's automotive lighting industry is rather like life in a small town: almost everyone knows what almost everyone else is doing, most of the time."

### C.    Government Investigations

133.         A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts in general, and Automotive Lamps in particular.  A JFTC official told a leading legal publication that the international automotive parts investigation would continue to widen because the

**REDACTED**

automotive industry as a whole comprises many sub-industries. He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

134.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC"). The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

135.     On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers. The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct. The DOJ has levied more than $2.5 billion in criminal fines against various automotive parts manufacturers.

136.     In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of several automotive parts manufacturers as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000.

137.     On March 13, 2012, Defendants announced that the JFTC had raided their headquarters and some branch offices on suspicion of antitrust violations. At the time, a person familiar with the investigation stated that the authorities suspected the suppliers had, for over a decade, been fixing the prices of Automotive Lamps ahead of bidding on the RFQs issued by OEMs. The *Nikkei* reported that the JFTC carried out raids at 20

**REDACTED**

locations, including the headquarters of Koito and Stanley Electric in Tokyo and Mitsuba in Kiryu City, Gumma Prefecture.

138.　　　The JFTC raided offices of Defendants as part of the spreading investigation into suspected price fixing on automotive parts.  According to its 2012 Annual Report, Koito underwent an on-site inspection by the JFTC on suspicion of violating the Act on Prohibition of Private Monopolization and Maintenance of Fair Trade concerning transactions for automotive lighting equipment.

139.　　　On March 21, 2013, the JFTC handed down fines totaling $49.1 million, including a $36 million fine against Koito for violating antitrust laws by forming a cartel to fix prices for Automotive Lamps. On March 21, 2013 the JFTC also announced cease-and-desist orders against the violating companies, requiring them to (i) immediately pass resolutions that they would terminate any illegal conduct in the Automotive Lamps industry, (ii) contact any automobile maker who may have purchased their Automotive Lamps through collusive bidding processes,(iii) refrain from engaging in such illegal conduct in the future, and (iii) implement employee antitrust compliance programs. According to the JFTC, fellow conspirator Stanley also violated antitrust laws, but did not receive a cease-and-desist order.

140.　　　The Defendants rigged the bidding process for supply contracts with automobile makers of Automotive Lamps by pre-ordaining the winners and losers. The JFTC explained that these companies "substantially restrained competition in the fields of headlamps and rear combination lamps ordered by each automobile company, by designating successful bidders and managing to have the designated successful bidders win the bids, respectively."

**REDACTED**

141.        To illustrate the anticompetitive conduct engaged in by Defendants Koito, and

Stanley and co-conspirator Ichikoh Industries, Ltd. ("Ichikoh"), the JFTC created a

diagram, which is shown below:



142.        The JFTC also published a chart, replicated in relevant part below, illustrating

when the Defendants conspired to rig-bids for RFQs issued by various automobile

manufacturers.

Figure 7

| Automobile Companies | Starting Date of the Violation (at least as early as) | Defendant Violators |
|---|---|---|
| Nissan Motor Co., Ltd. & Nissan Shatai Co., Ltd. ("Nissan") | February 2003 | Koito, Ichikoh, Stanley |
| Toyota Motor Corp. ("Toyota") | February 2007 | Koito, Ichikoh, Stanley |

**REDACTED**

| | | |
|---|---|---|
| Fuji Heavy Industries Ltd. ("Fuji") | July 2002 | Koito, Ichikoh, Stanley |
| Mitsubishi Motor Corp. ("Mitsubishi") | June 2004 | Koito, Stanley |
| Mazda Motor Corp. ("Mazda") | June 2004 | Koito, Stanley |

143.    Additionally, the JFTC published a second chart, replicated in relevant part below, stating the numbers of Automotive Lamps sold by Ichikoh and Defendant Koito to various automobile manufacturers at anticompetitive, artificially inflated prices.

Figure 8

| | Number of Automotive Lamps Ordered by Nissan | Number of Automotive Lamps Ordered by Toyota | Number of Automotive Lamps Ordered by Fuji | Number of Automotive Lamps Ordered by Mitsubishi | Number of Automotive Lamps Ordered by Mazda | Total |
|---|---|---|---|---|---|---|
| Koito | 1,380,010,000 | 271,330,000 | 806,960,000 | 222,700,000 | 747,590,000 | 3,428,590,000 |
| Ichikoh | 1,064,440,000 | 46,400,000 | 139,260,000 | (no violation) | (no violation) | 1,250,100,000 |
| Total Amt of Surcharge | 2,444,450,000 | 317,730,000 | 946,220,000 | 222,700,000 | 747,590,000 | 4,678,690,000 |

144.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

145.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation. The FBI

47

**REDACTED**

executed warrants and searched the offices of these companies. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

146.     To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

**D.     Defendant Koito Manufacturing Co., Ltd. Pleads Guilty to Price-Fixing Automotive Lighting Fixtures and HID Lamp Ballasts**

147.     On January 16, 2014, the DOJ announced that Defendant Koito Manufacturing Co., Ltd. had agreed to pay a $56.6 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive lighting fixtures sold to automobile manufacturers in the United States and elsewhere from at least as early as June 1997 and continuing until on or about July 2011 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain automotive HID lamp ballasts sold to automobile manufacturers in the United States and

48

**REDACTED**

elsewhere from at least as early as June 1997 and continuing until on or about July 2011 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

148.     According to the criminal Information, Koito Manufacturing Co., Ltd. and its co-conspirators carried out the automotive lighting fixtures conspiracy by:

    (a)     participating in meeting, conversations, and communications in Japan to discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

    (b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufacturers;

    (c)     agreeing, during those meetings, conversations , and communications, to allocate the supply of automotive lighting fixtures sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

    (d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in Japan;

    (e)     submitting bids, price quotations, and price adjustments to certain automobile manufacturers in Japan in accordance with the agreements reached;

    (f)     selling automotive lighting fixtures to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

    (g)     accepting payment for automotive lighting fixtures sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

    (h)     engaging in meetings, conversations, and communications in Japan for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price- fixing scheme; and

    (i)     employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

    **E.    Defendant Stanley Pleads Guilty to Price-Fixing HID Lamp Ballasts**

149.     On November 27, 2013, the DOJ announced that Defendant Stanley Electric Co., Ltd. had agreed to pay a $1.44 million fine and plead guilty to a one-count criminal Information charging it with participating in a combination and conspiracy to suppress

**REDACTED**

and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive HID lamp ballasts sold to an automobile manufacturer in the United States and elsewhere from at least as early as July 1998 through at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

150.     According to the Information filed, Defendant Stanley Electric Co., Ltd and its co-conspirators carried out the automotive parts combination and conspiracy by:

(a)   participating in meeting, conversations, and communications in Japan to discuss the bids and price quotations to be submitted to certain automobile manufacturers in the United States and elsewhere;

(b)   agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to certain automobile manufactures;

(c)   agreeing, during those meetings, conversations , and communications, to allocate the supply of automotive HID lamp ballasts sold to certain automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)   agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by certain automobile manufacturers in Japan;

(e)   submitting bids, price quotations, and price adjustments to certain automobile manufacturers in Japan in accordance with the agreements reached;

(f)   selling automotive HID lamp ballasts to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)   accepting payment for automotive HID lamp ballasts sold to certain automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)   engaging in meetings, conversations, and communications in Japan for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price- fixing scheme; and

(i)   employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

REDACTED

### F. Defendant Mitsuba Corporation Pleads Guilty to Price-Fixing Certain Automotive Parts

151.     On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation had agreed to pay a $135 million fine and plead guilty to a two-count criminal Information charging it with: (1) participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 through at least February 2010 in violation of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) altering, destroying, mutilating, concealing, covering up, falsifying and making entries in documents and tangible objects with the intent to impede, obstruction, and influence the investigation of the conduct charged in Count I, and in relation to and contemplation of such investigation, in violation of 19 U.S.C. § 1519. For purposes of Mitsuba's plea agreement, "automotive parts" are defined to include windshield wiper systems and components thereof, windshield washer systems and components thereof, starter motors, power window motors, fan motors, radiator fans, door mirrors, lamps, power seat motors, sunroof, door and tailgate motors, electric power steering motors, electronic throttle motors, horns, automotive electric relays and switches, automotive electric actuators, AC generators, and fuel pumps.

152.     According to the Information filed, Defendant Mitsuba Corporation and its co-conspirators carried out the automotive parts combination and conspiracy by:

(a)     participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

REDACTED

    (b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

    (c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

    (d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

    (e)    submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

    (f)    selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

    (g)    accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

    (h)    engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

    (i)    employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

153.      With respect to the obstruction of justice count, the Mitsuba Information charged as follows:

In or about February 2010, Executive A, acting on Defendant's behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.

After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy

REDACTED

documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

### G.     Likely Existence of a Cooperating Defendant

154.       The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ. In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

155.       In light of the guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

### H.     Additional Criminal Pleadings in the Automotive Parts Industry

156.       On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. had agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

**REDACTED**

157.        In the press release announcing the fine against Furukawa Electric Co. Ltd.,

Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the DOJ's

Antitrust Division, said that "[a]s a result of this international price-fixing and bid-rigging

conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in

cars sold to U.S. consumers." Ms. Pozen also stated that "[t]his cartel harmed an

important industry in our nation's economy, and the Antitrust Division with the Federal

Bureau of Investigation will continue to work together to ensure that these kinds of

conspiracies are stopped." The press release also quoted FBI's Special Agent in Charge

Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids

or contracts, it undermines the foundation of the United States' economic system," and

that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust

crimes."

158.        On January 30, 2012, the DOJ announced that Yazaki Corporation had agreed to

plead guilty and to pay a $470 million criminal fine and DENSO Corporation had agreed

to plead guilty and to pay a $78 million in criminal fine for their respective involvement

in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to

automobile manufacturers in the United States. According to the three-count criminal

Information filed against Yazaki, it engaged in three separate conspiracies: (i) to rig bids

for and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related

products sold to certain automobile manufacturers in the United States and elsewhere; (ii)

to rig bids for and to fix, stabilize, and maintain the prices of, instrument panel clusters

sold to certain automobile manufacturers in the United States and elsewhere; and (iii) to

fix, stabilize, and maintain the prices of fuel senders sold to an automobile manufacturer

**REDACTED**

in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.. According to the two-count felony charge against Defendant DENSO Corporation, it engaged in conspiracies to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold to an automobile manufacturer in the United States and elsewhere.

159.     In addition to Yazaki, five executives from Yazaki (all Japanese nationals)—Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, Kazuhiko Kashimoto, and Hisamitsu Takada—pleaded guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These five Yazaki executives will each pay a $20,000 criminal fine and serve prison time ranging from 15 months to two years.  The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

160.     In the press release announcing the fines against Yazaki Corporation, its executives, and DENSO Corporation, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"  "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic

REDACTED

system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

161.         On April 3, 2012, the DOJ announced that G.S. Electech, Inc. had agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

162.         On April 23, 2012, the DOJ announced that Fujikura Ltd. had agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

163.         On June 6, 2012, the DOJ announced that Autoliv Inc. had agreed to plead guilty to a two-count criminal Information and to pay a $14.5 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

164.         On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH had agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of

**REDACTED**

seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

165.     On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. had agreed to plead guilty and to pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to an automobile manufacturer in in the United States and elsewhere.

166.     On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. had agreed to plead guilty and to pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. in the United States and elsewhere. Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

167.     Deputy Assistant Attorney General Scott Hammond, recently stated that the automotive parts cartel is "the biggest [cartel] with respect to the impact on U.S. business and consumers."On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. had agreed to plead guilty and to pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Lamps sold to automobile manufacturers in the United States and elsewhere.

168.     In the press release announcing the fine against Diamond Electric Mfg. Co. Ltd., Robert D. Foley III, Agent in Charge, FBI Detroit Division said "[t]hose who engage in

REDACTED

price fixing, bid rigging and other fraudulent schemes harm the automotive industry by driving up costs for vehicle makers and buyers."

169.     On July 18, 2013, Panasonic Corporation had agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including HID lamp ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

170.     On September 26, 2013, eight additional Japanese automotive suppliers, in addition to Mitsuba Corporation, agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different automotive products:

(a)     Hitachi Automotive Systems Ltd. had agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of automotive parts, including, among others, air flow meters, fuel injection systems, and electronic throttle bodies, sold to automobile manufacturers in the United States and elsewhere;

(b)     Defendant Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufactures in the United States and elsewhere.  Mitsuba also agreed to plead guilty to one count of obstruction of justice, because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

(c)     Mitsubishi Electric Corporation had agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere. For purposes of Mitsubishi Electric Corporation's plea agreement, "automotive parts" are defined to include, among other automotive products, fuel injectors, fuel pumps, MAP Sensors, and throttle bodies;

(d)     Mitsubishi Heavy Industries Ltd. had agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

**REDACTED**

    (e)    T.RAD Co. Ltd. had agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and automatic transmission fluid warmers ("ATF warmers") sold to automobile manufacturers in the United States and elsewhere;

    (f)    Valeo Japan Co. Ltd. had agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

    (g)    JTEKT Corporation had agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered steering assemblies sold to automobile manufacturers in the United States and elsewhere;

    (h)    NSK Ltd. agreed to had plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

    (i)    Yamashita Rubber Co. Ltd. had agreed to plead guilty and to pay an $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

171.    The diagram below, which was prepared by the DOJ, illustrates the September 26, 2013 guilty pleas and the corresponding automotive parts to which the various manufacturers have admitted price-fixing.



172.     On October 9, 2013, Takata Corporation had announced that it agreed to pay $71.3 million to settle antitrust charges brought by the United States federal prosecutors for its role in a conspiracy to price-fix seatbelts.

173.     On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and driveshaft parts installed in automobiles sold in the United States and elsewhere.

REDACTED

174.     On November 27, 2013, the DOJ announced that Defendant Stanley Electric Co. Ltd., as stated above, had agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

175.     On January 16, 2014, the DOJ announced that Defendant Koito Manufacturing Co. Ltd., as stated above, had agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive HID lamp ballasts installed in cars sold in the United States and elsewhere.

176.     On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. had agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

177.     On February 13, 2014, the DOJ announced that Bridgestone Corp. had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

178.     On April 23, 2014, the DOJ announced that Showa Corp. had agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

179.     On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. had agreed to plead guilty and to pay a $52.1 million criminal fine for its role in a conspiracy

**REDACTED**

to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors installed in automobiles sold in the United States and elsewhere.

180.        On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. had agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

181.        On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. had agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

182.        On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. had agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

183.        On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. had agreed to plead guilty and to pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

**REDACTED**

184.	On December 1, 2014 the DOJ announced that Kazumi Umahashi, a former executive of Defendant Mitsuba Corporation, had agreed to serve thirteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts, including windshield wiper systems, windshield washer systems, starter motors, power window motors, and fan motors, sold to automobile manufacturers in the United States and elsewhere.

185.	On January 27, 2015, the DOJ announced that Sanden Corp. had agreed to plead guilty and to pay a $3.2 million criminal fine for its participation in a combination and conspiracy to allocate the sales of, rig bids for, and fix, raise, and maintain the prices of compressors used in air conditioning systems sold to Nissan North America, Inc. in the United States and elsewhere.

186.	On February 5, 2015, the DOJ announced that a federal grand jury returned a two-count Indictment against two former executives of Defendant Mitsuba Corporation, Hiroyuki Komiya and Hirofumi Nakayama, (1) for their participation in a conspiracy to fix prices and rig bids for various automotive parts including windshield wiper systems and components sold to Honda Motor Company Ltd., Nissan Motor Co. Ltd., Toyota Motor Corp., Chrysler Group, LLC, and Fuji Heavy Industries Ltd. and certain of their subsidiaries in the United States and elsewhere, and (2) for obstruction of justice for ordering the destruction of evidence related to the conspiracy.  According to the Indictment, these former executives knowingly and corruptly persuaded and attempted to persuade employees of Mitsuba Corporation to destroy documents and delete electronic data that may contain evidence of antitrust crimes in the United States and elsewhere.

**REDACTED**

187.     On March 31, 2015, the DOJ announced that Defendant Robert Bosch GmbH had agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, oxygen sensors and starter motors sold to automobile and internal combustion engine manufacturers in the United States and elsewhere.

188.     On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. had agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to certain subsidiaries of Honda Motor Co., Ltd., in the United States and elsewhere.

189.     To date, thirty-five companies and fifty-five executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry. Each of the thirty-five companies has either pleaded guilty or agreed to plead guilty and altogether, they have agreed to pay a total of more than $2.5 billion in criminal fines.

190.     "This criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold," said FBI's Special Agent in Charge Andrew G. Arena. "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," Arena also said. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

**I.      Illustrative Examples**

**REDACTED**



**REDACTED**



REDACTED



**J.     Damage to Plaintiffs and Other Automobile Dealers Caused by Defendants' Illegal Activities.**

200.     Defendants' conspiracy resulted in Defendants charging inflated prices to firms who directly purchased Automotive Lamps from them and in those purchasers raising their prices to subsequent purchasers.

201.     Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Automotive Lamps they sold to Plaintiffs and the Classes, firms who sold such Automotive Lamps and vehicles passed Defendants' overcharges on to Plaintiffs and the Classes.

202.     The impact of Defendants' conspiracy on Plaintiffs' businesses was substantial. Automobile dealers were substantially injured by higher prices paid for Auto Lamps and vehicles.

REDACTED

203.     Because, among other reasons, of the imperfect nature of competition among automobile dealers and the differentiation among dealers by brand and by location, Plaintiffs and the Classes had to and did absorb, at the very least, a significant portion of the overcharges that they paid due to Defendants' illegal activities.

204.     Plaintiffs have standing and have suffered damage compensable by indirect purchaser laws and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy.

## CLASS ACTION ALLEGATIONS

205.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that during the Class Period,  (a) indirectly purchased Automotive Lamps manufactured by the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or (b) purchased vehicles containing Automotive Lamps manufactured by the Defendants or any current or former subsidiary, affiliate thereof or co-conspirator.

206.     Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the law of unjust enrichment and the antitrust, unfair competition, and consumer protection laws of the states whose laws are set forth in the Second and Third Claims below, (except California as to unjust enrichment claims), as well as the unjust enrichment laws of Missouri, Massachusetts and Illinois. The states whose laws are set forth in the Second and Third Claims below, as well as Missouri, Massachusetts, and Illinois, are collectively referred to as the "Indirect Purchaser States."  These claims are brought by Plaintiffs on behalf of themselves and persons and entities in the Indirect

**REDACTED**

Purchaser States listed in the Second, Third, and Fourth Claims as follows (the "Damages Class"):

> All automobile dealers, in the Indirect Purchaser States, that, during the Class Period (a) indirectly purchased Automotive Lamps manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or (b) purchased vehicles containing Automotive Lamps manufactured by one of the Defendants or any current or former subsidiary, affiliate or co-conspirator thereof.

207.    The Nationwide Class and the Damages Class are referred to herein as the "Classes." Excluded from the Classes are the Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, persons who purchased Spark Plug(s), Standard Oxygen Sensors(s), or Air Fuel Ratio Sensor(s) directly from Defendants and any judge assigned to hear this matter at either the district or appellate level and any employees or agents of those judges.

208.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

209.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Lamps sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

69

REDACTED

    (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

    (d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

    (e)    Whether the alleged conspiracy violated state antitrust, unfair competition law, and/or consumer protection laws, as alleged in the Second and Third Claims for Relief;

    (f)    Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

    (g)    Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

    (h)    The effect of the alleged conspiracy on the prices of Automotive Lamps sold in the United States during the Class Period;

    (i)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

    (j)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

    (k)    The appropriate class-wide measure of damages for the Damages Class.

210.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Lamps purchased indirectly from the Defendants and/or their co-conspirators.

211.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are

**REDACTED**

represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

212.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

213.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

214.     The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

215.     The Defendants' price-fixing conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to Automotive Lamps;

(b)     The prices of Automotive Lamps have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Defendants charged purchasers of their Automotive Lamps inflated, fixed and stabilized prices for such Automotive Lamps;

**REDACTED**

(d)     Having paid higher prices for components of the cars they sold to Plaintiffs and the Classes and the Automotive Lamps they sold to Plaintiffs and the Classes, firms who sold Defendants' Automotive Lamps and vehicles to Plaintiffs and the Classes passed Defendants' overcharges on to them;

(e)     Defendants' overcharges passed through each level of distribution as they traveled to Plaintiffs and the Classes; and

(f)     Automobile dealers purchasing Automotive Lamps and vehicles containing Automotive Lamps have been deprived of free and open competition.

216.     During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Lamps, as a result of Defendants' conspiracy.

217.     An increase in the prices of Automotive Lamps caused an increase in the price of vehicles during the Class Period.

218.     Plaintiffs and the Classes are entitled to the overcharges they paid for Automotive Lamps.

219.     The market for Automotive Lamps and the market for vehicles are inextricably linked and intertwined because the market for Automotive Lamps exists to serve the vehicle market. Without the vehicles, the Automotive Lamps have little to no value because they have no independent utility and must be inserted into vehicles to serve any function. Indeed, the demand for vehicles creates the demand for Automotive Lamps.

220.     Automotive Lamps are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Lamps follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Lamps can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

221.     Just as Automotive Lamps can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of

**REDACTED**

Automotive Lamps affect prices paid by indirect purchasers of new motor vehicles containing Automotive Lamps.

222.     Automotive Lamps have their own part numbers, which permit them to be tracked.

223.     Automotive Lamps are pieces of sophisticated electrical equipment that are necessary to operate a vehicle.

224.     Automotive Lamps are found in every vehicle and can be removed from a finished vehicle and replaced.

225.     The Automotive Lamps subject to Defendants' conspiracy and at issue in this lawsuit only have one use: to be inserted into vehicles.  Whether Automotive Lamps are sold by themselves or in vehicles, their purpose is to be inserted into vehicles.

226.     Automotive Lamps comprise a not insignificant portion of the cost of a vehicle.

227.     The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of Automotive Lamps and, as a direct and foreseeable result, the price of new motor vehicles containing Automotive Lamps. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of Automotive Lamps on prices for new motor vehicles even though such products

**REDACTED**

contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of Automotive Lamps affects changes in the price of new motor vehicles. In such models, the price of Automotive Lamps would be treated as an independent or explanatory variable. The model can isolate how changes in the price of Automotive Lamps impact the price of new motor vehicles containing Automotive Lamps while controlling for the impact of other price-determining factors.

228.       The precise amount of the overcharge impacting the prices of new motor vehicles containing Automotive Lamps can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed-through the chain of distribution. Thus, the economic harm to Plaintiffs and class members can be quantified.

229.       By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Lamps than they would have paid in the absence of the Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent and Plaintiffs' and Class members' damages are measureable.

### PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.       The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims

230.       Plaintiffs repeat and re-allege the allegations set forth above.

**REDACTED**

231.       Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) the public announcements of the government investigations into Automotive Lamps price-fixing began in March 2012.[1]

232.       Plaintiffs and the members of the Classes are automobile dealers who had no direct contact or interaction with any of the Defendants in this case and had no means by which they could have discovered the combination and conspiracy described in this Complaint the public announcements of the government investigations into Automotive Lamps price-fixing began in March 2012.

233.       No information in the public domain was available to the Plaintiffs and the members of the Classes prior to the public announcements of the government investigations beginning in March 2012 that revealed sufficient information to suggest that any one of the Defendants was involved in a criminal conspiracy to price-fix and rig bids for Automotive Lamps. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with

---

[1] Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest), September 26, 2013 for Mitsuba, the date that the DOJ publicly announced it agreed to plead guilty; January 16, 2014 for Koito, the date that the DOJ publicly announced it agreed to plead guilty; ███████████████████████████████████████████
███████████████████████ No information in the public domain was available to the Plaintiffs and the members of the Classes prior to these dates that revealed sufficient information to suggest that Defendants Mitsuba, Koito and Stanley were involved in the combination or conspiracy alleged herein.  Therefore, the statute of limitations did not begin to run because Plaintiffs and members of the Classes did not and could not discover their claims, or in the alternative, because fraudulent concealment tolled the statute of limitations, until these dates for the respective defendants.

REDACTED

OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

234.       For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**B.       Fraudulent Concealment Tolled the Statute of Limitations**

235.       In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until the public announcement of the government investigations into Automotive Lamps price-fixing in March 2012.[2]

236.       Before that time, Plaintiffs and members of the Classes were unaware of the Defendants' unlawful conduct, and did not know before then that they were paying supra-competitive prices for Automotive Lamps throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

237.       The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

---

[2] *See* footnote 4.

**REDACTED**

238.     Specifically, as then Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

239.     As state in the Information filed against Defendant Koito Manufacturing Co., Ltd., the Defendants and their co-conspirators employed "measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection."

240.     Defendant Mitsuba Corporation also pleaded guilty to a charge of obstruction of justice in which it explicitly admitted to "altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruction, and influence" the DOJ's investigation into the price-fixing of several automotive parts. According to Mitsuba Corporation's plea agreement, in February 2010, three of Mitsuba's senior executives learned that the offices of a co-conspirator had been searched by law enforcement authorities in connection with an investigation of possible antitrust violations, and they directed their subordinates and other employees to "conceal and destroy documents and electronic files" in both the United States and Japan. Mitsuba Corporation's plea agreement confirmed that such evidence was concealed and destroyed.

241.     By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing.  Automotive Lamps are not exempt from antitrust regulation, and thus, before March 2012, Plaintiffs reasonably considered it to be a competitive industry. Defendants met and communicated in secret and agreed to keep

**REDACTED**

the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' Automotive Lamp prices before March 2012.

242.     Plaintiffs and the members of the Classes did not discover, and could not have discovered the alleged contact, conspiracy, or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

243.     Throughout the course of the conspiracy, the Defendants met and communicated in secret in order to conceal their conspiracy from the public and avoid detection thereof. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

244.     Because Defendants' agreements, understandings, and conspiracies were kept secret until March 2012, Plaintiffs and members of the Classes before that time were unaware of Defendants' unlawful conduct, and they did not know before then that they were paying supracompetitive prices for Automotive Lamps throughout the United States during the Class Period.

**REDACTED**

245.        As a result of Defendants' fraudulent concealment of their conspiracy, the running

of any statute of limitations has been tolled with respect to any claims that Plaintiffs and

the members of the Classes have alleged in this Complaint.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

246.        Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

247.        The Defendants and unnamed co-conspirators entered into and engaged in a

contract, combination, or conspiracy in unreasonable restraint of trade in violation of

Section 1 of the Sherman Act (15 U.S.C. § 1).

248.        The acts done by the Defendants as part of, and in furtherance of, their and their

co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done

by their officers, agents, employees, or representatives while actively engaged in the

management of their affairs.

249.        During the Class Period, Defendants and their co-conspirators entered into a

continuing agreement, understanding, and conspiracy in restraint of trade to artificially

fix, raise, stabilize, and control prices for Automotive Lamps, thereby creating

anticompetitive effects.

250.        The anticompetitive acts were intentionally directed at the United States market

for Automotive Lamps and had a substantial and foreseeable effect on interstate

commerce by raising and fixing prices for Automotive Lamps throughout the United

States.

251.        The conspiratorial acts and combinations have caused unreasonable restraints in

the market for Automotive Lamps.

**REDACTED**

252.        As a result of the Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Lamps have been harmed by being forced to pay inflated, supra-competitive prices for Automotive Lamps.

253.        In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth herein.

254.        Defendants and their co-conspirators' conspiracy had the following effects, among others:

a.        Price competition in the market for Automotive Lamps has been restrained, suppressed, and/or eliminated in the United States;

b.        Prices for Automotive Lamps sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.        Plaintiffs and members of the Nationwide Class who purchased Automotive Lamps indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

255.        Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Lamps and vehicles containing Automotive Lamps than they would have paid and will pay in the absence of the conspiracy.

REDACTED

256.        Plaintiffs and members of the Nationwide Class will continue to be subject to the

Defendants' price-fixing, bid-rigging, and market allocations, which will deprive

Plaintiffs and members of the Nationwide Class of the benefits of free competition,

including competitively-priced Automotive Lamps and vehicles containing Automotive

Lamps.

257.        Plaintiffs and members of the Nationwide Class will continue to lose funds due to

overpayment for Automotive Lamps and vehicles containing Automotive Lamps because

they are required to purchase vehicles and Automotive Lamps to continue to operate their

businesses.

258.        Plaintiffs and members of the Nationwide Class continue to purchase vehicles and

Automotive Lamps on a regular basis.

259.        Vehicles and Automotive Lamps continue to be sold at inflated and supra-

competitive prices.

260.        The alleged contract, combination, or conspiracy is a *per se* violation of the

federal antitrust laws.

261.        Plaintiffs and members of the Nationwide Class will be at the mercy of the

Defendants' unlawful conduct until the Court orders an injunction.

262.        Plaintiffs and members of the Nationwide Class are entitled to an injunction

against the Defendants, preventing and restraining the violations alleged herein.

<u>**SECOND CLAIM FOR RELIEF**</u>

**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

263.        Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

**REDACTED**

264.     During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy with respect to the sale of Automotive Lamps in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

265.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Automotive Lamps and to allocate customers for Automotive Lamps in the United States.

266.     In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

a.     participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Lamps at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Lamps sold in the United States;

b.     allocating customers and markets for Automotive Lamps in the United States in furtherance of their agreements; and

c.     participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

267.     Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to Automotive Lamps.

82

**REDACTED**

268.     Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

269.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

     a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Ignition Coil price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Ignition Coil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

     b.     During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

     c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

     d.     By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq*.

270.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

**REDACTED**

a.      During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, Automotive Lamps at supra-competitive levels.

b.      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Lamps.

c.      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Automotive Lamps;  and  (2) Allocating among themselves the production of Automotive Lamps.

d.      The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Automotive Lamps has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Lamps sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased

REDACTED

Automotive Lamps directly or indirectly from the Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Lamps than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

271.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq*.

a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Ignition Coil prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Automotive Lamps or vehicles in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Automotive Lamps or vehicles in the District of

**REDACTED**

Columbia, paid supra-competitive, artificially inflated prices for Automotive Lamps, including in the District of Columbia.

b.      During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

272.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, et seq.

(a)      Defendants' unlawful conduct had the following effects: (1) Automotive Lamps' price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive Lamps' prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiff and members of the Damages Class were deprived of free and open competition; and (4) Plaintiff and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.

273.     The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq*.

a.     The Defendants' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.     During the Class Period, the Defendants' illegal conduct substantially affected Illinois commerce.

c.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, the Defendants have entered into agreements in restraint of trade in violation of 740 Illinois Compiled Statutes 10/1, et seq.

**REDACTED**

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under 740 Illinois Compiled Statutes 10/1, *et seq.*[3]

274.   The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

a.   Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.   During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

c.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

---

[3] Dealership Plaintiffs recognize that their claims under the Illinois Antitrust Act were dismissed in the *Wire Harness* action.  Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

**REDACTED**

275.        Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

      a.        Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

      b.        During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

      c.        As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.        By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

276.        Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq*.

      a.        Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Automotive Lamps price competition was restrained,

**REDACTED**

suppressed, and eliminated throughout Maine; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

277.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

a.      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and

REDACTED

members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

b.      During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq*.

278.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq*.

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.      During the Class Period, the Defendants' illegal conduct substantially affected Minnesota commerce.

91

**REDACTED**

    c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq.*

279.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

    a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Automotive Lamps or vehicles in Mississippi, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased Automotive Lamps or vehicles in Mississippi, paid supra-competitive, artificially inflated prices for Automotive Lamps, including in Mississippi.

    b.     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

**REDACTED**

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

280.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

        a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

        b.      During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

        c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

      d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

281.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

      a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Automotive Lamps or vehicles in Nevada, were deprived of free and open competition, including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased Automotive Lamps or vehicles in Nevada, paid supra-competitive, artificially inflated prices for Automotive Lamps, including in Nevada.

      b.      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

      c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq*. Accordingly,

**REDACTED**

Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

282. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

a. Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

c. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq.*

283. Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

**REDACTED**

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.*   Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq*.

284.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York;

REDACTED

(3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Automotive Lamps or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased Automotive Lamps or vehicles in New York, paid supra-competitive, artificially inflated prices for Automotive Lamps when they purchased, including in New York,.

b.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

285.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

a.      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or

97

**REDACTED**

purchased Automotive Lamps or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Automotive Lamps or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Automotive Lamps, including in North Carolina.

b.     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

c.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

286.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

REDACTED

competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

287.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

99

**REDACTED**

    c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq*.

288.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

    a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Automotive Lamps or vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased Automotive Lamps or vehicles in South Dakota, paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps, including in South Dakota.

    b.     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

100

**REDACTED**

    c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

289.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

    a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Automotive Lamps or vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased Automotive Lamps or vehicles in Tennessee, paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps, including in Tennessee.

    b.      During the Class Period, the Defendants' illegal conduct had a substantial effect on Tennessee commerce.

**REDACTED**

    c.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

290.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

    a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Utah; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

    b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

    c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.* Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

291.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq.*

a.     Defendants' and their co-conspirators' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

b.     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2451, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2451, *et seq.*

292.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

REDACTED

a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects:   (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Lamps prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Automotive Lamps or vehicles in West Virginia, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased Automotive Lamps or vehicles in West Virginia, paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps, including in West Virginia.

b.      During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*.   Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

293.      Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq*.

**REDACTED**

       a.      Defendants' and their co-conspirators' combinations or conspiracies had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

       b.      During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

       c.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

       d.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq.*

294.      Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiffs and members of the Damages Class have paid more for Automotive Lamps than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the

**REDACTED**

antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

295.         In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

296.         Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## THIRD CLAIM FOR RELIEF

### Violation of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Damages Class)

297.         Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

298.         Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

299.          Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq.*

a.         Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Lamps were sold, distributed,

**REDACTED**

or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.    The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

c.    Defendants' unlawful conduct had the following effects:  (1) Ignition Coil price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Ignition Coil prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

d.    During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

e.    As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

f.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

**REDACTED**

300.　　　　　Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq*.

　　　　a.　　During the Class Period, Defendants marketed, sold, or distributed Ignition Coil(s) in California and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, by engaging in the acts and practices specified above.\

　　　　b.　　During the Class Period, the Defendants' illegal conduct substantially affected California commerce and consumers.

　　　　c.　　This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

　　　　d.　　Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq*., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq*., of the California Business and Professions Code, set forth above;

　　　　e.　　Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq*., of the

**REDACTED**

California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

f.     Defendants' acts or practices are unfair to consumers of Automotive Lamps  (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

g.     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout California; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased Automotive Lamps or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased Automotive Lamps or vehicles in California, paid supracompetitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps, including in California.

h.     Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

i.     Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

j.     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

**REDACTED**

    k.    As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

301.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in the District of Columbia.

    b.    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

    c.    During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

    d.    Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by Defendants for Automotive Lamps. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.

REDACTED

e.    Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Lamps because they were unaware of the unlawful overcharge and because they had to purchase Automotive Lamps as a necessary part of the vehicles they purchased.

f.    Defendants' conduct with regard to sales of Automotive Lamps, including their illegal conspiracy to secretly fix the price of Automotive Lamps at supra-competitive levels and overcharge purchasers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs.

g.    Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and the Damages Class, including those who resided in the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and the Damages Class, including those who resided in the District of Columbia and/or purchased Automotive Lamps in the District of Columbia, paid supra-competitive, artificially inflated prices for Automotive Lamps, including in the District of Columbia.

h.    The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Lamps, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Automotive Lamps.

REDACTED

    i.    As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

302.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

    a.    Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

    b.    During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

    c.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

    d.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**REDACTED**

303.          Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

a.          Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Lamps were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.          Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for Automotive Lamps. Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price. Moreover, Plaintiffs lacked any meaningful choice in purchasing Automotive Lamps because they were unaware of the unlawful overcharge and because they had to purchase Automotive Lamps in order to be able to operate their vehicles. The Defendants' conduct with regard to sales of Automotive Lamps, including their illegal conspiracy to secretly fix the price of Automotive Lamps at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiffs and the public. The Defendants took grossly unfair advantage of Plaintiffs.

c.          The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by

REDACTED

Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Lamps as set forth in N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and Automotive Lamps.

d. Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps.

e. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

f. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

g. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

304. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

a. Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at

114

**REDACTED**

artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

b.      Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the Automotive Lamps they had purchased inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

c.      The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

d.      Because of the Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased Automotive Lamps were misled to believe that they were paying a fair price for Automotive Lamps or the price increases for Automotive Lamps were for valid business reasons.

e.      Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or Automotive Lamps in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices, including in New York; and (4) Plaintiffs and

**REDACTED**

members of the Damages Class, who resided in and/or made purchases of vehicles or Automotive Lamps in New York, paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps, and were subjected to Defendants' deceptive practices, including in New York.

f.   Defendants knew that their unlawful trade practices with respect to pricing Automotive Lamps would have an impact on all purchasers in New York and not just the Defendants' direct customers.

g.   Defendants knew that their unlawful trade practices with respect to pricing Automotive Lamps would have a broad impact, causing consumer class members who indirectly purchased Automotive Lamps to be injured by paying more for Automotive Lamps than they would have paid in the absence of Defendants' unlawful trade acts and practices.

h.   During the Class Period, Defendants' marketed, sold, or distributed Automotive Lamps in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

i.   During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Lamps in New York.

j.   Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

305.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

116

**REDACTED**

      a.     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

      b.     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

      c.     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Automotive Lamps or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased Automotive Lamps or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for Automotive Lamps and vehicles containing Automotive Lamps, including in North Carolina.

      d.     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of Automotive Lamps and vehicles. The

REDACTED

Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by the Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of the Defendants' price-fixing conspiracy. The Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware. Moreover, the Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

e. During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed Automotive Lamps in North Carolina.

f. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

306. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*[4]

---

[4] Dealership Plaintiffs recognize that their claims under the South Carolina Unfair Trade Practices Act were dismissed in previous actions. Dealership Plaintiffs assert this claim here, individually and collectively, to preserve it for appeal.

**REDACTED**

      a.     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

      b.     During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

      c.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

307.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

      a.     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Lamps were sold, distributed, or obtained in Vermont.

**REDACTED**

    b.     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for Automotive Lamps. Defendants owed a duty to disclose such facts. Defendants misrepresented to all purchasers during the Class Period that their Ignition Coil prices were competitive and fair.

    c.     Defendants' unlawful conduct had the following effects: (1) Automotive Lamps price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Lamps prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Lamps.

    d.     As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

    e.     Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of Automotive Lamps, likely misled purchasers acting reasonably under the circumstances to believe that they were purchasing Automotive Lamps at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and,

**REDACTED**

accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

308.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

309.     Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra*. except California. Plaintiffs also bring this claim under the laws of Missouri, Massachusetts, South Carolina and Illinois on behalf of the Plaintiffs who have their primary places of business in those three states and the class members in those states.

310.     As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Lamps.

311.     Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for Automotive Lamps.

312.     Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct.  Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

121

**REDACTED**

313.          Pursuit of any remedies against the firms from which Plaintiffs and the members

of the Damages Class purchased Automotive Lamps and vehicles containing Automotive

Lamps subject to the Defendants' conspiracy would have been futile, given that those

firms did not take part in the Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.          The Court determine that this action may be maintained as a class action under

Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable

notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be

given to each and every member of the Classes;

B.          That the unlawful conduct, contract, conspiracy, or combination alleged herein be

adjudged and decreed:

a.          An unreasonable restraint of trade or commerce in violation of Section 1

of the Sherman Act;

b.          A *per se* violation of Section 1 of the Sherman Act;

c.          An unlawful combination, trust, agreement, understanding and/or concert of

action in violation of the state antitrust and unfair competition and consumer

protection laws as set forth herein; and

d.          Acts of unjust enrichment by Defendants as set forth herein.

C.          Plaintiffs and the members of the Damages Class recover damages, to the

maximum extent allowed under such laws, and that a joint and several judgment in favor of

Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to

be trebled to the extent such laws permit;

REDACTED

D.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.      Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.      Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**REDACTED**

DATED:  September 25, 2015                    Respectfully submitted,


                                             /s/  *Gerard V. Mantese*
                                             Gerard V. Mantese
                                             (Michigan Bar No. P34424)
                                             Alex Blum (Michigan Bar No. P74070)
                                             Mantese Honigman P.C.
                                             1361 E. Big Beaver Road
                                             Troy, Michigan 48083
                                             Telephone: (248) 457-9200
                                             gmantese@manteselaw.com
                                             ablum@manteselaw.com


Don Barrett                                  Jonathan W. Cuneo
Brian Herrington                             Joel Davidow
David McMullan                               Daniel Cohen
Barrett Law Group, P.A.                      Victoria Romanenko
P.O. Box 927                                 Cuneo Gilbert & LaDuca, LLP
404 Court Square                             507 C Street, N.E.
Lexington, MS 39095                          Washington, DC 20002
Telephone: (662) 834-2488                    Telephone: (202) 789-3960
dbarrett@barrettlawgroup.com                 jonc@cuneolaw.com
bherrington@barrettlawgroup.com              joel@cuneolaw.com
dmcmullan@barrettlawgroup.com                danielc@cuneolaw.com
                                             vicky@cuneolaw.com


Shawn M. Raiter                              Michael J. Flannery
Larson • King, LLP                           Cuneo Gilbert & LaDuca, LLP
2800 Wells Fargo Place                       300 North Tucker
30 East Seventh Street                       Suite 801
St. Paul, MN  55101                          St. Louis, MO  63101
Telephone: (651) 312-6500                    Telephone:  (314) 226-1015
sraiter@larsonking.com                       mflannery@cuneolaw.com


Phillip Duncan                               Thomas P. Thrash
Richard Quintus                              Thrash Law Firm, P.A.
Duncan Firm, P.A.                            1101 Garland Street
900 S. Shackleford, Suite 725                Little Rock, AR 72201
Little Rock, AR 72211                        Telephone: (501) 374-1058
Telephone:  (501) 228-7600                   tomthrash@sbcglobal.net
phillip@duncanfirm.com

**REDACTED**

richard@duncanfirm.com

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

*Attorneys for Dealership Plaintiffs*